UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JAMAIL ARNOLD,

     Defendant.

_____/

Case No. 08-20556

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS[14]**

Defendant Jamail Arnold ("Arnold") is charged in a three-count Indictment alleging the following violations:  (1) felon in possession of a firearm in violation of 18 U.S.C. § 922(g); (2) possession with intent to distribute cocaine in violation of 18 U.S.C. § 841(a)(1); and (3) a forfeiture count pursuant to 18 U.S.C. § 924(d).  This matter comes before the Court on Arnold's motion to suppress evidence seized as a result of a warrantless automobile search after a traffic stop that occurred on March 13, 2008 and evidence subsequently seized, pursuant to a search warrant, from the Porter Street apartment.

An evidentiary hearing on Arnold's motion to suppress was held on August 3, 2009. The Court fully credits the testimony of the police officers at that hearing.  Based on that testimony, this Court finds that (1) the officers had a reasonable suspicion that Arnold was engaged in drug trafficking and thus conducted a lawful *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 30-31 (1968), and protective weapons pat-down of Arnold; and (2) the officers had probable cause to believe that evidence of drug trafficking was contained in Arnold's

vehicle and thus conducted a lawful search of Arnold's trunk under the automobile exception to the warrant requirement, *see United States v. Ross*, 456 U.S. 798, 820-821 (1982). Because the *Terry* stop and *Ross* search of the trunk were legal, this Court rejects Arnold's argument that the evidence seized in the subsequent search of the Porter Street apartment, made pursuant to a valid warrant, should be suppressed as "fruit of the poisonous tree."

I.   **Facts**

   A.  **Testimony of Deputy Scott Watson**

In October 2007, officers for the Jackson Narcotics Enforcement Team ("JNET"), a multi-jurisdictional task force that investigates drug trafficking in the Jackson, Michigan area, opened an investigation on Jamail Arnold based on information received from an anonymous, confidential informant. Deputy Scott Watson, a member of JNET, has been with the Jackson Sheriff's Department for 11 years, has participated in over 1,000 narcotics investigations throughout his career, has written thousands of reports related to his duties, and has worked with between 50 and 100 confidential informants. (8/3/09 Hrg. Tr. at 9-12.) During October 2007, Deputy Watson received several tips from the same anonymous informant stating that Arnold was dealing crack and cocaine, that he had an address at Ashton Ridge, that he was associated with two other addresses, that he was on parole, and that he drove a maroon or burgundy Ford Expedition. (Tr. at 13-15.) Through contact with Arnold's parole officer, with the secretary of state, and surveillance, Deputy Watson was able to verify that Arnold was associated with the three addresses provided by the informant, that Arnold drove a Ford Expedition, and that he was on parole. The informant told Deputy Watson that she was in a close, personal relationship with Arnold, and that he

2

was physically abusive towards her.  (Tr. at 13-15.)  Although JNET officers installed a tracker device on the Ford Expedition, it did not leave the state as the  informant predicted, and the investigation was subsequently closed after about six weeks.  (Tr. at 15-16.)  This did not alter Deputy Watson's belief that the informant was credible because she had provided information that was verified by the police.  (Tr. at 16, 82.)

On March 12, 2008, the same informant contacted Deputy Watson again.  She indicated that Arnold was going to be on his way to Detroit to pick up a large quantity of cocaine.  JNET officers began surveillance on I-94 in an attempt to locate the Ford Expedition that it was believed Arnold would be driving.  The vehicle was not located on that date, and no report was generated.  (Tr. 16-17, 83.)

The next day, the informant contacted Deputy Watson again, telling him that Arnold was driving up and down Francis Street selling drugs, that he had been at the Sunoco on Francis and Wall Streets in the City of Jackson, that he was also hanging out at an address on Mason Street, and that he was driving a burgundy, mid-80's model Monte Carlo vehicle. Based on this tip, Deputy Watson conducted surveillance in the area identified by the informant, located the vehicle described by the informant on Wall Street and observed numerous people standing around the Monte Carlo with its trunk open.  Deputy Watson was unable to identify Arnold as one of the individuals standing around the Monte Carlo. (Tr. at 18-20.)

Watson then contacted and met up with Detective Sergeant Todd Pelletier.  The two plain-clothed officers got into one unmarked vehicle and located the Monte Carlo on Mason Street in a driveway.  (Tr. at 20-22.)  They left the area because the high volume of foot traffic increased the risk of someone noticing their surveillance.  Later, they observed the

3

Monte Carlo on Francis Street and recognized Arnold as the driver because he was known to JNET officers from prior drug investigations. After turning around to pursue the Monte Carlo, Watson and Pelletier lost sight of it. Deputy Watson then called the informant, arranging to have the informant meet the officers within the next few minutes. (Tr. 21-24.)

Watson and Pelletier met with the informant on South Jackson Street. (Tr. at 24.) The informant got into the unmarked police car, repeated that Arnold had been driving up and down Francis Street selling drugs, and offered to set up a controlled drug purchase. (Tr. at 24-25.) At that time, Watson signed her up as a confidential informant ("C.I.") by conducting a LIEN check for outstanding warrants and having her sign an agreement. (Tr. at 25-26.) Watson then asked the C.I. to contact Arnold on her cell phone. Watson observed the C.I. make a call on her cell phone, observed that her cell phone identified "Jamail" as the person she was calling, and heard the conversation between the C.I. and Jamail because the C.I. had the call on speaker phone while she was sitting in the police car with Watson and Pelletier. (Tr. 25-26.) Watson testified that, based on his experience with the C.I., he had no reason to doubt that the C.I. was speaking with Arnold on her cell phone. (Tr. at 84.)

The C.I. told Arnold that they "want[ed] to get hooked up." (Tr. at 26.) Based on Watson's training and experience as a narcotics investigator, he believed that she was indicating to Arnold that they set up a time and place where she could purchase narcotics from him. (Tr. at 26.) Arnold's response was that he had everything with him, that he did not need to go anywhere to get it, and that the C.I. should give him a call when she was ready. (Tr. at 27.) Based on Watson's training and experience, he believed that this meant that Arnold was in possession of narcotics, and that he could conduct the transaction when

4

the C.I. was ready.  (Tr. at 27.)  No drug or dollar amounts were discussed between the C.I.

and Arnold, as is typical in Watson's experience as a narcotics investigator.  (Tr. at 27, 85-

86.)

After the conversation between the C.I. and Arnold ended, Watson and Pelletier

dropped the C.I. off and proceeded to once again locate Arnold in the Monte Carlo.  The

officers located the Monte Carlo on Chittock Street, south of Morrell, but did not see anyone

in or around the car.  (Tr. at 27-28.)  At that time, while maintaining surveillance on the

Monte Carlo, the officers contacted other JNET officers and apprised them of the day's

occurrences, Arnold's criminal history which included a robbery conviction and a weapons

offense, and further informed these officers that they had good information that Arnold was

in possession of a large amount of narcotics.  (Tr. at 28-29.)

After other officers established surveillance of the Monte Carlo, Watson once again

contacted the C.I. and arranged to and did pick her up from the same location where they

had earlier met.  (Tr. at 29.)  At Watson's request, the C.I. once again contacted Arnold

using her cell phone.  The C.I. once again placed the call on speaker phone so that Watson

and Pelletier could hear both ends of the conversation.  (Tr. 29-30.)  The C.I. told Arnold

that they were just about ready and Arnold should come over.  Arnold responded that he

would be right there.  The C.I. and Arnold arranged to meet near Union or Fourth Street.

Based on Watson's experience and training, he believed the conversation was referring to

the fact that the C.I. would be buying drugs from Arnold.[1]  Watson informed the other JNET

---

[1]The Court finds credible Watson's testimony that this second conversation occurred
in the manner he recalled despite his admission that he originally omitted it in his original
police report yet submitted it in a supplemental report.

officers that the C.I. had contacted Arnold and that Arnold would soon be delivering the narcotics.  (Tr. at 30-32.)

After Watson and Pelletier let the C.I. out of their unmarked car and while they were driving to the designated area for the drug transaction, they were notified that a traffic stop had been initiated on Arnold in the area of Greenwood and Union Streets.   Watson and Pelletier arrived on the scene after Arnold had been placed into custody, was handcuffed, and still on the sidewalk.  The Monte Carlo had already been searched.  The officers who searched the car retrieved a large amount of crack cocaine, some powder cocaine, digital scales, and sandwich baggies from the trunk.  Arnold's only passenger in the Monte Carlo, Jeffrey Graham, was arrested for a parole violation.  (Tr. at 32-34.)

JNET officers later made contact with Camille Truman, who was driving Arnold's 2000 Ford Expedition.  (Tr. at 38.)  She informed JNET investigators that Arnold had been staying at her house for the past few days and that they had been dating.  (Tr. at 39.) Watson then obtained a state search warrant for Truman's apartment.   JNET officers located two handguns, a white powdery substance, cash, digital scales, and two pill bottles with the name "Jamail."  (Tr. at 39.)  When Truman appeared at the residence during the course of the search, she informed Watson that Arnold had been staying there, that he was the only male that had keys to the apartment, and that she and Arnold had been to Detroit the previous night with another male.  (Tr. at 40.)  She also informed Watson that, after grocery shopping, she had observed Arnold placing grocery items into the trunk of the Monte Carlo.  (Tr. at 40.)  Watson obtained a second search warrant to use keys seized during the March 13, 2008 traffic stop to determine whether they fit the lock on Truman's apartment.  They did.  (Tr. at 40-41.)

6

Later that March 2008, Watson met with the C.I. for debriefing along with Deputy Cullen Knoblauch. (Tr. at 43-44.) The C.I. was paid $200 for the information she had provided, and was later deactivated because she was no longer providing information. (Tr. at 44.)

### B.  Testimony of Detective Sergeant Todd Pelletier

Detective Sergeant Pelletier has been with the Michigan State Police for over 14 years, and is currently a JNET supervisory officer. (Tr. at 88.) Pelletier participated in the investigation opened on Arnold by Watson in October 2007. He was aware that Watson had received information about Arnold from an anonymous source. (Tr. at 94-95.) He was also aware that the investigation had been closed after about six weeks because the Arnold vehicle on which a tracking device had been placed showed that it had not left the state. (Tr. at 96.)

On March 13, 2008, Pelletier learned from Watson that he had new information from his source. Specifically, that Arnold had received a large amount of narcotics, the general area where Arnold was selling those drugs, and the vehicle Arnold was traveling around in. (Tr. at 96.) Pelletier and Watson attempted to locate the burgundy Monte Carlo identified by the informant and to set up surveillance. They located the Monte Carlo, which was unoccupied, in an area where they could not safely maintain surveillance due to heavy foot traffic. (Tr. at 97-98.) Some time later, they observed Arnold driving the Monte Carlo southbound on Francis Street at Cooper. (Tr. at 98.)

After Watson called the informant, he and Pelletier met up with the informant in Watson's unmarked car. After being signed up as a C.I., the C.I. placed a call to Arnold. Because the call was on speaker phone, Watson and Pelletier were able to hear both sides

7

of the conversation between the C.I. and Arnold.  (Tr. 100-101.)  Because the C.I. had previously provided information that had been verified, Pelletier had no reason not to believe the C.I. when she said she was calling and speaking with Arnold.  (Tr. at 103.) Pelletier testified that the C.I. told Arnold that she was looking to "hook up" some acquaintances.  Based on his training and experience, Pelletier determined that the term "hooked up" meant to purchase illegal narcotics or drugs and further testified that drug amounts are generally not specified in these types of conversations.  (Tr. at 101-102.) When Pelletier heard Arnold say that he had everything with him, he interpreted this to mean that Arnold did not need to go and get anything; that he had the drugs with him.  (Tr. at 103.)

Watson and Pelletier dropped off the C.I., located Arnold's unoccupied Monte Carlo on Chittock Street, and began surveillance.  (Tr. at 103.)  After other JNET officers arrived, Pelletier and Watson once again picked up the C.I. so that the C.I. could call Arnold and set up a drug transaction.  (Tr. at 104-05.)  The C.I. called Arnold while she was in the unmarked police car with Watson and Pelletier.  Both officers could hear both sides of the conversation between the C.I. and Arnold because the C.I.'s phone was on speaker phone. (Tr. at 105.)  The C.I. told Arnold that her acquaintances were there, and Arnold replied that he would be right over.  They agreed to meet at a residence on Union Street.  (Tr. at 106, 120-21.)  Pelletier and Watson then heard from the other JNET officers that Arnold was in the Monte Carlo and on the move toward the agreed-upon meeting spot.  (Tr. at 106, 121.) Arnold was followed by unmarked cars until a marked car could make a stop.  (Tr. at 106.) Watson and Pelletier arrived on the scene after Arnold had been stopped, and Pelletier did not participate in the search of Arnold's vehicle.  (Tr. at 107.)

8

### C.  Testimony of Detective Sergeant Andy Williams

Detective Sergeant Andy Williams has been a law enforcement officer for 14 years, is employed by the Jackson City Police Department, and has served with JNET since January 2006.  Williams assisted with the investigation of Arnold in October 2007 and in the effort to locate Arnold's vehicle on March 12, 2008.  (Tr. at 157-59.)

On March 13, 2008, Williams was contacted by Watson.  Watson informed him that he had received information from an informant that Arnold was going to be in possession of a large quantity of cocaine.  (Tr. at 160.)  On that date, Williams was assisting in the surveillance of Arnold's maroon Monte Carlo when he observed the Monte Carlo traveling north on Chittock and West onto Morrell Street.  (Tr. at 161.)  Williams then contacted Sergeant Hiller, a uniformed police officer with the Jackson City Police Department, to inform him that Arnold's vehicle was on the move.  Another JNET officer, Ryan Spiedel, observed Arnold's vehicle commit a traffic violation, and Williams apprised Hiller of that fact and asked him to conduct a stop on the vehicle.  (Tr. at 161.)  Williams was aware of Arnold's criminal history and conveyed that information to Hiller.  (Tr. at 162-63.)

After Hiller stopped Arnold's vehicle, Williams arrived on the scene.  Hiller engaged the driver, Arnold, and Williams approached Arnold shortly thereafter.  Williams observed Hiller ask Arnold for consent to search, to which Arnold replied "No."  (Tr. at 163-64.)  He heard Hiller inform Arnold that he wanted to pat him down for weapons, to which Arnold replied "No."  (Tr. at 164.)  As Hiller attempted to conduct a pat down, Arnold turned away.  At that point, Williams attempted to conduct his own pat down.  Again, Arnold resisted.  Williams attempted to conduct a pat down based on information that there was a large

9

amount of cocaine in his vehicle and Arnold's criminal history which included a weapons offense.  (Tr. at 164.)

Williams began to pat down the left side of Arnold's clothing, but Arnold turned away from him and did not allow him to conduct the pat down for weapons.  At that time, Williams removed his handcuffs, told Arnold to place his hands behind his back, and placed Arnold under arrest for resisting and opposing.  (Tr. at 164-65.)  The only other passenger in the stopped vehicle was also placed under arrest for a parole violation.  (Tr. at 166.)  The Monte Carlo was then searched by Deputy Knoblauch and Officer Spiedel.  At that time, based upon the information provided by the C.I., their surveillance of Arnold, and Arnold's conduct, the officers believed that Arnold had controlled substances in the vehicle he was driving.  (Tr. at 166-67.)  After being searched, the car was impounded by Phelps Wrecker service.  (Tr. at 167.)

### D.  Testimony of Officer Kevin Hiller

Officer Hiller is a sergeant in the Jackson Police Department, has been with the Jackson Police Department for 20 years, and worked with JNET from 2000 to 2003.  (Tr. at 174.)  Hiller testified that he was conducting duty patrol on March 13, 2008 when Williams contacted him about making a traffic stop on Arnold.  At that time, Hiller was informed that Arnold was driving a vehicle that was under surveillance, had at least one weapons conviction, that he was driving an older model Monte Carlo, that he was in possession of a large amount of crack cocaine, and he was currently leaving Chittock Street going westbound on Morrell.  (Tr. at 176-77.)  Hiller made a traffic stop of the vehicle.  (Tr. at 178.)  Because of his knowledge of the nature of the Arnold investigation and Arnold's criminal history, Hiller removed the keys from the ignition so as to prevent the

10

stop from becoming mobile.  It was Hiller's experience that individuals with large quantities of narcotics run.  (Tr. at 178.)  Hiller attempted to conduct a pat down of Arnold for officer safety reasons because experience has taught him that there is an association between individuals with large quantities of narcotics and weapons.  (Tr. at 178-80.)  Arnold would not let Hiller pat him down.  At that point, Williams took over and later arrested Arnold.  (Tr. at 179-80.)  Arnold was handcuffed prior to being patted down.  (Tr. at 189.)  Hiller testified that he never considered this to be a routine traffic stop because it was initiated by a narcotics team.  (Tr. at 180.)  He did not participate in the vehicle search.  (Tr. at 182.)

### E.  Testimony of Detective Cullen Knoblauch

Detective Cullen Knoblauch was also at the scene of the March 13, 2008 traffic stop. He questioned the passenger, Jeffrey Graham, while he was still in the vehicle and learned that Graham was on parole.  (Tr. at 201-02.)  Knoblauch searched the vehicle, including the trunk, based on information from Deputy Watson that a C.I. had contacted Arnold and had set up a drug purchase, that Arnold had stated that he had the drugs on him and did not need to go anywhere to get them, and that he was on his way to the meeting place he had set up with the C.I. at the time of the traffic stop.  (Tr. at 203-04.)

### F.  Testimony Regarding Inventory Search

Detective Sergeant Pelletier testified that JNET follows the inventory search policy of the Michigan State Police.  When the driver of a vehicle is subject to a custodial arrest and separated from the vehicle, that policy provides that a properly licensed passenger will be allowed to take custody of the vehicle when so authorized by the driver.  (Tr. at 195-96.) In an inventory search, any passenger compartment, including the trunk, is searched.  The vehicle is then towed from the scene once the search is completed.  (Tr. at 196.)

11

Because Arnold's vehicle was stopped on a public roadway and could not be safely left at the scene and because both the driver and the passenger were arrested, the towing service used by JNET, Phelps Towing, was contacted.  This contact was made prior to Arnold's mother arriving at the scene.  (Tr. at 197, 199.)  Officer Hiller subsequently learned that Arnold's mother was present at the scene.  He did not ask her to take possession of Arnold's vehicle before it was towed away, and Arnold's mother did not ask if she could take the car.  (Tr. at 190-91, 208.)

## III.  Analysis

Defendant Arnold argues that the evidence seized from the trunk of the Monte Carlo must be suppressed because (1) there was no probable cause for a warrantless automobile stop; (2) there was no reasonable suspicion to justify a *Terry* stop, (3) a search incident to Arnold's arrest for resisting and opposing the police officers would not justify a search of the trunk under the Supreme Court's recent decision in *Arizona v. Gant*, ___ U.S. ___, 129 S. Ct. 1710 (2009); (4) an inventory search was unwarranted and the inevitable discovery doctrine inapplicable because Arnold's mother was present at the scene and could have taken possession of Arnold's car; and (5) because the search warrant for the E. Porter Street apartment was premised on "tainted" evidence, all evidence seized at the apartment should be suppressed as "fruit of the poisonous tree."  For the reasons stated below, the Court rejects Defendant's arguments.

12

### A. There Was Reasonable Suspicion Justifying a *Terry* Stop and Protective Weapons Pat Down

Despite Defendant's arguments to the contrary, the officers had a reasonable suspicion that Defendant was engaged in drug trafficking and were thus justified in conducting an investigative *Terry* stop of Defendant's vehicle on March 13, 2008. In *United States v. Perez*, 440 F.3d 363 (6th Cir. 2006), the Sixth Circuit analyzed a *Terry* investigative stop in the context of a vehicle stop and search for narcotics, summarizing the inquiry as follows:

> Under *Terry*, an officer is permitted to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. Likewise, a moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that its occupants had engaged, were engaging or were about to engage in criminal activity. Courts must determine whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing.

440 F.3d at 370-371 (internal quotation marks and citations omitted). The *Perez* Court then set out how courts are to analyze the constitutionality of a *Terry* stop. "The dual inquiry for evaluating the reasonableness of an investigative stop requires examination of 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* at 369-370 (quoting *Terry,* 392 U.S. at 20). Noting that law enforcement officers should be afforded some amount of deference in determining the presence of "reasonable suspicion," the court instructed that officers should "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 371 (internal quotation marks and

13

citations omitted).  The court summarized its task as follows: "In considering the totality of the circumstances, we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Id.* (internal quotation marks and citations omitted).

Here, the investigative *Terry* stop of Defendant Arnold's vehicle and the protective weapons pat down of Arnold were proper based on the officers' reasonable and articulable suspicion that Arnold was engaged in drug trafficking activities.  First, the Court once again reiterates its finding that it found the testifying officers to be credible.  Their reasonable suspicions about Arnold were based on the following.  The C.I. was reliable because she had provided information that had been verified by the police including Arnold's association with three different addresses; that he drove a Ford Expedition; that he was on parole; and that on March 13, 2008, Arnold was driving a burgundy, mid-80's Monte Carlo vehicle in the area of Francis and Wall Streets.  On March 13, 2008, the officers had witnessed the Monte Carlo with its trunk open and surrounded by people in the vicinity the informant had identified.  A short while later, they recognized Arnold as the driver of the Monte Carlo as it was traveling in the same area.  Also on that date, officers listened to both ends of two conversations between the C.I. and Arnold that, in their experience and training as narcotics investigators, was to set up a drug transaction that day and further indicated to them that Arnold had the requested drugs with him when the calls were made.  After the call between the C.I. and Arnold setting up a meeting spot for the drug transaction was completed, officers who were maintaining surveillance of the Monte Carlo observed it moving to the designated spot.  The officers were aware that the investigation involved a

14

large amount of drugs and that Arnold had a prior robbery conviction and weapons offense. Considering the totality of the circumstances, this Court finds that the officers had a reasonable suspicion that Arnold was engaged in criminal activity and were thus justified in making a *Terry* stop on March 13, 2008. Moreover, the officers did not exceed the scope of that *Terry* stop when they conducted a protective weapons pat down of Arnold. The officers testified that, based on their experience and training, there is an association between drug trafficking activity and weapons and further testified that at the time of the stop they had been informed of Arnold's prior weapons offense. In *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004), the Sixth Circuit observed that "the authority to conduct a *Terry* stop is 'narrowly drawn' so as to 'permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'" *Id.* (quoting *Terry*, 392 U.S. at 27).

**B.    There Was Probable Cause To Search**

Defendant Arnold next argues that, even if the *Terry* stop was justified, the permissible scope of that stop was exceeded when the officers searched the trunk of the Monte Carlo. Defendant further argues that, in light of the Supreme Court's recent decision in *Gant*, the search of the Monte Carlo and its trunk cannot be justified as a search incident to Arnold's arrest for resisting and opposing. This Court agrees that neither *Terry* nor *Gant* justify the officers' search. Rather, the warrantless search of the Monte Carlo, including its trunk, was justified under the automobile exception to the warrant requirement recognized in *Ross*.

15

As the Supreme Court recognized in *Gant*, although an automobile search may not be warranted as a search incident to arrest, there are other existing rationales for a vehicle search.  "If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821 (1982), authorizes a search of any area of the vehicle in which the evidence might be found."  *Gant*, 129 S. Ct. at 1721.  Further distinguishing the holding in *Gant*, the Court observed that "Ross allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader."  *Id.*

Relying on *Ross* and its progeny, the Sixth Circuit has adopted and applied the automobile exception in numerous cases.

> Under the automobile exception to the warrant requirement, law enforcement officers may search a readily movable vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime.  Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Probable cause may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers.

*United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (citations omitted).

Here, probable cause existed to believe that the Monte Carlo contained evidence of criminal activity.  In addition to the facts stated above, Arnold's evasive and suspicious behavior during the *Terry* stop supports a finding of probable cause.  The officers knew that Arnold had made statements to the C.I. that led them to believe that he had drugs on him. Based on the conversation between the C.I. and Arnold and based on their surveillance of Arnold in the Monte Carlo, they believed that Arnold was on his way to the spot where the drug transaction with the C.I. was to take place.  At the time of the March 13, 2008 search,

16

there was a fair probability that contraband or evidence of a crime would be found in the Monte Carlo or its trunk. Accordingly, considering the totality of the circumstances, this Court concludes that probable cause existed to believe that the Monte Carlo or its trunk contained evidence of drug trafficking.[2]

### C.   The Search of the Porter Street Apartment Was Valid

Finally, Defendant Arnold argues that evidence seized, pursuant to a search warrant, from the Porter Street Apartment must be suppressed because it was based on evidence that was illegally seized from Arnold's trunk and thus constitutes "fruit of the poisonous tree." In light of this Court's determination that the search of the trunk was valid, this argument fails.

## III.   Conclusion

For the above-stated reasons, Defendant Arnold's motion to suppress is DENIED.


s/Nancy G. Edmunds                                    
Nancy G. Edmunds
United States District Judge

Dated: September 23, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 23, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer                                    
Case Manager

---

[2]In light of this ruling, there is no need for the Court to address the Government's additional argument that the drugs would inevitably have been discovered pursuant to a valid inventory search.